IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

KAREEM PERTHA and SAMEEKA
FRANCE,

               Defendants.

CRIMINAL CASE NO.

1:14-CR-00309-LMM-JFK

## ORDER AND REPORT AND RECOMMENDATION

Pending before the court are Defendant Sameeka France's motion [Doc. 26] to suppress and amended motion [Doc. 28] motion to suppress evidence seized as the result of the execution of a Fulton County Superior Court search warrant at 5502 Jamerson Drive, Atlanta, Georgia. Defendant Kareem Pertha adopted the motion [Doc. 38] and amended motion [Doc. 39] to suppress. Also pending before the court is Defendants' motion [Doc. 42] to dismiss the indictment for violation of Federal Rule of Criminal Procedure 5. The Government opposes the motions to suppress and to dismiss. [Docs. 50 and 51].

**Motion to Suppress Evidence Seized Pursuant to Search Warrant**

In support of the motions to suppress, Defendants contend that the affidavit offered in support of the search warrant for 5502 Jamerson Drive, Atlanta, Georgia, does not establish probable cause because the affidavit fails to establish a nexus between the alleged criminal activity, theft and credit card fraud, and the place to be searched, Defendants' residence, and that, because the affidavit is facially deficient in establishing probable cause, the good faith exception does not apply in this case. [Doc. 28 at 6; Doc. 54 at 2-10]. The Government counters arguing that the affidavit for the search warrant, based on the reasonable inferences drawn from the facts set forth therein, establishes a nexus between the criminal conduct and the residence and that, in any event, the good faith exception does apply. [Doc. 51 at 5-9].

## I.     Search Warrant

On October 28, 2013, Special Agent Deborah Loving ("Affiant"), Georgia Bureau of Investigation ("GBI"), obtained a search warrant for 5502 Jamerson Drive, Atlanta, Georgia, from a Fulton County Superior Court Judge to search for evidence of theft by taking and financial transaction card fraud. [Doc. 51, Exhibit B ("Search Warrant")]. The warrant authorized the search of the residence for articles of clothing purchased from J. Crew between August 24, 2013, and September 9, 2013, and for

receipts related to the purchase and/or return of such clothing articles; cellular telephones, computers and other electronic devices; documents and other items related to identified stolen credit cards, to two identified Mastercards and to a Citibank debit card owned by Defendant Pertha; documents and related financial information referencing non-occupants of residence; diaries, date books and related items documenting daily activities, travel and meetings and financial management; driver's licenses and other identification and social security cards, credit cards and bank cards for non-residents; and skimming devices or devices used to re-encode credit and/or gift cards. [Id.].

In support of the warrant, Affiant provided the following information to establish probable cause. [Doc. 51, Exhibit A ("Affidavit")]. Affiant is a GBI agent, assigned for two years in Conyers, Georgia, and she investigates thefts, homicides, assaults and child molestations. Her training includes tactics, methods and techniques pertaining to criminal investigations, and she works closely with agents possessing extensive knowledge and training conducting investigations. [Id at 3].[1] On October 23, 2013, Affiant received information from Special Agent Sean Camp, United States

---

[1]Pagination citation to CM/ECF numbering.

Capitol Police, concerning the activities of Defendants Pertha and France. Agent Camp provided the following facts. [Id.].

On September 11, 2013, a Senate Federal credit card was used without the card holder's authorization to conduct three fraudulent transactions: September 6 at a Staples in Laurel, Maryland, and a Uno Chicago Grill, in Baltimore, Maryland, and on September 7 at a J. Crew store in Towson, Maryland. A fourth transaction using this credit card was attempted on September 7 at Ruth's Chris Steakhouse in Baltimore, Maryland, but was denied for insufficient funds ("NSF"). The total charges were $1,610.41. [Id.]. During Agent Camp's investigation, additional fraud victims were uncovered, including the unauthorized use of a Bank of America ("BOA") credit card, lost/stolen on August 13, and used on August 24 at J. Crew, in Atlanta, Georgia, to purchase $1,001.11 in merchandise [Id. at 3-4] and the unauthorized use of a U.S. Bank credit card on September 7 at Ruth's Chris to complete the transaction when the aforementioned Senate Federal credit card was declined [Id. at 4].

With respect to the transaction at Staples, the receipt indicated that two $200 Mastercards were purchased, one of which was used at the Fairfield Inn, Laurel, Maryland, at a Negril Eatery and at a White Castle. The receipt for Fairfield Inn indicated that Defendant Pertha, 5502 Jamerson Drive, Atlanta, checked in on

4

September 4 and out on September 6. The other Mastercard was used for a transaction with OBE First Insurance. [Id.]. The J. Crew transactions involving fraudulent credit card transactions, as provided by a loss prevention manager, are: August 24, in Atlanta, Georgia, fraudulent use of the BOA credit card to purchase merchandise; September 3, in Towson, Maryland, Defendants exchanged goods purchased in Atlanta and paid a difference using Defendant's Pertha's Citibank debit card; September 4, in Columbia, Maryland, video surveillance showed Defendant Pertha returning items from the Towson purchase; September 7, in Towson, video surveillance showed Defendants fraudulently using the Senate Federal credit card to purchase merchandise[2]; and September 9, no location provided, Defendant Pertha exchanged items purchased using the Senate Federal credit card and paying the difference with his Citibank debit card. [Id.].

Agent Camp, using the information that he had gathered and a Lexus Nexus search, obtained a driver's license photograph for Defendant Pertha, listing his residence as 5502 Jamerson Drive, Atlanta, and learned that Defendant France resided with him. Defendant Pertha's October power bill indicated the same residence. Agent

---

[2]Surveillance photographs show individuals wearing the same clothing at the Ruth's Chris on that date making the aforementioned purchase. [Id. at 4-5].

Camp found that surveillance videos of the individuals conducting the fraudulent transactions matched the driver's license photographs of Defendants, and he prepared photographic arrays for each Defendant and two J. Crew employees identified Defendants as being the individuals conducting one or more of the fraudulent transactions. [Id.].

On October 26, 2013, Affiant obtained address information from the Fulton County Tax Assessor's Office which indicated that Defendant France's address was also 5502 Jamerson Drive, Atlanta. [Id.].

Additional facts will be set forth as necessary during discussion of the motions to suppress.

## II. Discussion

In deciding whether to sign a search warrant, the issuing judge is "'simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and the 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting Illinois v. Gates, 103 S. Ct. 2317, 2332 (1983)). In this regard, "'probable cause is a fluid concept – turning on the assessment

6

of probabilities in particular factual contexts[.]'" United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting Gates, 103 S. Ct. at 2329).  For this reason, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing Gates, 103 S. Ct. at 2331-32; United States v. Ventresca, 85 S. Ct. 741, 746 (1965)); accord United States v. Hatcher, 300 Fed. Appx. 659, 663 (11th Cir. 2008) (same).  In reviewing the issuance of the search warrant, the undersigned must determine only that the issuing judge had a "substantial basis" for concluding that probable cause existed to uphold the warrant.  See Gates, 103 S. Ct. at 2331; see also Massachusetts v. Upton, 104 S. Ct. 2085, 2085 (1984) (per curiam).  The validity of the warrant is considered based on the totality of the circumstances.  See Brundidge, 170 F.3d at 1352.

Specifically, when the challenge raised - as is the case herein - is a lack of nexus between the place searched and the items being sought and involves the residence of a defendant, the Eleventh Circuit Court of Appeals states that "the affidavit must supply the authorizing magistrate with a reasonable basis for concluding that

7

Defendant[s] might keep evidence of his [or her] crimes at [their] home, i.e., a 'safe yet accessible place.'" United States v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009) (quoting United States v. Feliz, 182 F.3d 82, 87-88 (1st Cir. 1999)). The court in Kapordelis further stated in connection with searching a suspect's home:

> "The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained. In normal situations, few places are more convenient than one's residence for use in planning and hiding fruits of a crime."

Id. (quoting United States v. Green, 634 F.2d 222, 226 (5th Cir. Unit B 1981)). Therefore, while the affidavit must establish a link between the defendant and the residence to be searched as well as between the residence and criminal activity, "[t]here need not be an allegation that the illegal activity occurred at the location to be searched. . . ." Id. at 1310 (citing, e.g., United States v. Anton, 546 F.3d 1355, 1358 (11th Cir. 2008) (holding that evidence establishing that a defendant possesses contraband of the type that would normally be expected to be hidden in a residence will support the search); United States v. Jenkins, 901 F.2d 1075, 1080-81 (11th Cir. 1990) (finding that nexus between the items to be seized and a defendant's residence

AO 72A
(Rev.8/82)

can be established circumstantially if the contraband is capable of being hidden therein)).[3]

      In this case, the affidavit establishes, without challenge by either Defendant, that Defendants engaged in a number of fraudulent credit card transactions involving at least three victims. [Affidavit at 4-5]. The fraudulent conduct outlined in the affidavit began on August 24 at a J. Crew in Atlanta, before Defendants apparently headed to Maryland to continue their illegal conduct by exchanging items purchased in Atlanta, making new J. Crew purchases with additional exchanges and returns and using the credit cards to purchase food and to secure a hotel from September 4 to 6, 2013. Defendants also used an illegally obtained Mastercard for a transaction with an insurance company. The last J. Crew transaction, location not provided, occurred on

---

[3] In Anton, the affidavit for a search warrant for the defendant's residence provided that agents had observed the defendant, along with his trailer, at gun shows and had observed the defendant in possession of firearms at the gun shows, that an informant had advised that the defendant possessed over 300 guns, and that, based on the agent's experience, convicted felons and firearms dealers typically store contraband items on their property. Based on this information, the court found that the search warrant was supported by probable cause. 546 F.3d at 1358. And, in Jenkins, a case involving a bank larceny, the Eleventh Circuit Court of Appeals held that a warrant established probable cause to search the residence of the individual who probably committed the theft because the items sought were capable of being hidden in a residence and because, based on the agent's opinion, stolen items are likely to be hidden in the residence of the thief. 901 F.2d at 1081.

AO 72A
(Rev.8/82)

September 7 involving the exchange of some items previously purchased. [Id.]. The affidavit, also not contested by Defendants, establishes that Defendants resided - before and during the time of the fraudulent activity and subsequently when the search took place - at 5502 Jamerson Drive, Atlanta, the location of the search. [Id. at 5].

Courts have applied the reasoning set forth in Kapordelis and the other cases cited *supra* and upheld search warrants issued by judges drawing reasonable inferences that a participant in crimes involving unlawful financial and fraudulent activity, stolen property, and related criminal conduct will probably maintain evidence of those crimes in a secure and readily accessible location, that is, his or her residence. In United States v. Abboud, 438 F.3d 554 (6th Cir. 2006), the Sixth Circuit Court of Appeals rejected a defendant's argument that the affidavit for a search warrant failed to establish a sufficient nexus between the criminal activity, bank fraud, and his residence and business. Holding that the defendant's argument was without merit, the court stated, "One does not need Supreme Court precedent to support the simple fact that records of illegal business activity are usually kept at either a business location or at the defendant's home. Likewise, personal financial records are also usually stored at a person's home or place of business." Id. at 572. See, e.g., United States v. Maestas, 546 F.2d 1177, 1179-80 (5th Cir. 1977) (noting that there was no firsthand evidence in

affidavit that items related to crimes of interstate transportation of forged checks would be in the defendant's residence, the court stated that "this is not always necessary" and noted for instance that "evidence that a defendant has stolen material which one normally would expect him to hide at his residence will support a search of his residence"); United States v. Waxman, 572 F. Supp. 1136, 1146 (E.D. Pa. 1983) (in upholding warrant to search defendant's residence based on reasonable inferences from facts in affidavit, which lacked direct evidence linking the residence to the crime but stating that the defendant, an art collector, was implicated in a theft of fine art which had not surfaced in art community, the court noted, ". . . 'direct observation [of the objects in the place] . . . [is] not necessary and . . . normal inferences about where criminals would be likely to hide property . . . [are] sufficient, taking into account the type of crime, the nature of the items, and opportunity for concealment'") (citation omitted); United States v. Santarsiero, 566 F. Supp. 536, 542 (S.D. N.Y. 1983) (in a case in which search warrant sought evidence of fraudulent use of credit cards at residence of known participant in the criminal activity, the court rejected the defendant's argument that the affidavit failed to provide a nexus between his actions and his residence stating that "[t]he items specified in the search warrant were the types of things that a person who had participated in the [crimes alleged] might possess[, and

11

m]oreover, defendant's car and residence were the only logical or likely locations at which these items might be found") (citations and internal quotations omitted).

Likewise, in this case, the totality of the facts presented in the affidavit, including that Defendants were active participants in the ongoing identity fraud crimes involving the use of fraudulent credit cards and that Defendants resided at the residence sought to be searched, allowed the issuing judge to reach the reasonable conclusion that evidence of those crimes, such as, fraudulently obtained J. Crew merchandise, electronic devices, information regarding the specific fraudulently obtained credit cards and related financial and business records, other fraudulently obtained credit cards and/or stolen identity information for non-residents, Defendant Pertha's Citibank records, skimming and other credit card re-encoding devices and Defendants' travel and related records, such as diaries, would likely or probably be concealed in Defendants' residence. No other logical location for these items to be secreted before, during and especially after the continuing criminal activity presented itself based on the facts set forth in the affidavit. See United States v. Alexander, 574 F.3d 484, 490 (8th Cir. 2009) ("'Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant. . . .'") (citation omitted); United States v. Wiley, 475 F.3d 908, 916 (7th Cir.

2007) ("'. . . issuing judges are entitled to draw reasonable inferences about where evidence is likely to be found given the nature of the evidence and the type of offense'") (citation omitted). Accordingly, "[w]here[, as in this case,] a 'common sense and realistic' interpretation of the affidavit supports a reasonable likelihood that evidence of a crime might be found in a particular place, probable cause is not lacking." United States v. Adigun, 2011 WL 2194253, at *14 (N.D. Ga. May 4, 2011), report and recommendation adopted by 2011 WL 2198308 (N.D. Ga. June 3, 2011) (citation omitted).

Defendants' argument that probable cause is undermined because the bulk of the criminal activity outlined in the affidavit occurred in Maryland [Doc. 54 at 5-6] ignores the common sense inferences that the issuing judge was allowed to draw about the ongoing nature of the criminal activity involved in this case. The judge could reasonably conclude that Defendants did not suddenly begin on August 24, 2013, and abruptly end on September 9, 2013, their fraudulent conduct and could also conclude that their activities involved additional transactional fraud victims. It is also entirely reasonable for the issuing judge to determine that Defendants did not carry around with them all of the indicia of committing and evidence associated with the type of illegal conduct outlined in the affidavit. With respect to the conduct alleged in the affidavit,

13

Defendants left from Atlanta and, it is reasonable to conclude, returned to Atlanta at the end of this spree of illegal activity.  So, even if Defendants had indicia of their criminal activity with them in Maryland, their residence remains the logical resting place for long-term storage of that evidence and other items associated with theft and credit card fraud.  As the district court in <u>Santarsiero</u> stated, "'[J]udges are not required to exhibit a naivete from which ordinary citizens are free.'"  566 F. Supp. at 542 (quoting <u>United States v. Stanchich</u>, 550 F.2d 1294, 1300 (2nd Cir. 1977)).  The affidavit establishes a nexus between the alleged criminal conduct and the place to be searched.

Finally, even if the court found that the affidavit for the search warrants failed to establish probable cause, the court agrees with the Government that the good faith exception to the exclusionary rule should be applied to this case.  [Doc. 51 at 7-9].  In <u>United States v. Leon</u>, 104 S. Ct. 3405 (1984), and <u>Massachusetts v. Sheppard</u>, 104 S. Ct. 3424 (1984), the Supreme Court established a good faith exception to the exclusionary rule where officers placed reasonably objective reliance on a search warrant later determined to be defective.  In <u>United States v. Accardo</u>, 749 F.2d 1477 (11th Cir. 1985), the Eleventh Circuit Court of Appeals discussed the good faith exception established by the Supreme Court.  With the exception of cases "where the

14

issuing magistrate wholly abandoned his judicial role[,]" or where "a warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]'" or where "a warrant may be so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid[,]" the good faith exception applies. Id. at 1480 & n.4 (citations omitted). The good faith exception "require[s] suppression 'only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" Id. at 1480 (quoting Leon, 104 S. Ct. at 3422). In making this decision, the totality of the circumstances surrounding issuance of the search warrant may be considered. Id. at 1481.

Defendants, however, contend that the exception does not apply in this case because the warrant is based on an affidavit lacking of probable cause to establish a link between the residence and the items to be seized. [Doc. 54 at 7-10]. Defendants' attack lacks merit. First, the court notes that the affidavit supporting the search warrant was not a "'bare-bone' statement of nothing more than conclusory allegations" which the Supreme Court in Leon found indicative of warrants falling within the third exception to the good faith doctrine. See United States v. Glinton, 154 F.3d 1245,

15

1257 (11th Cir. 1998). The court has outlined the detailed information provided by the affiant in support of the search warrant, including the Defendants' association and participation in the fraudulent credit card activity and Defendants' ties to the location to be searched. [Affidavit]. This affidavit presented much more than conclusory, "bare-bone" assertions for consideration by the issuing judge. The affidavit provided factual details for the issuing judge to consider and evaluate. And other courts that have considered similar affidavits offered in support of search warrants for residences closely associated with individuals engaged in fraudulent conduct and related activities have applied the good faith exception. See, e.g., United States v. Van Shutters, 163 F.3d 331, 337-38 (6th Cir. 1998) (affidavit established the defendant's participation in ongoing criminal activity, i.e., fraudulent purchases of automobiles using counterfeit checks, etc., and provided details regarding the residence to be searched, including that rooms in the residence were "available to John Doe aka Jim Thompson aka John Van Shutters" but failed to state explicitly why affiant linked defendant to the residence). The agent was, therefore, entitled to rely upon the judge's evaluation and determination that "given all the circumstances set forth in the affidavit before him, there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place." Gates, 103 S. Ct. at 2332. Accordingly, even if the affidavit for

16

the search warrant did not establish probable cause, the good faith exception applies and the motions to suppress should be denied.

## III.     Conclusion

For these reasons, the court **RECOMMENDS** that Defendants' motions [Docs. 26, 28, 38 and 39] to suppress evidence be **DENIED**.

<u>**Motion to Dismiss**</u>

Defendants Pertha and France seek dismissal of the indictment contending that the court should exercise its supervisory powers because of the alleged violation of their Fed. R. Crim. P. 5 right to the prompt presentation before a magistrate judge upon their arrest.    According to Defendants they were taken into federal custody in December 2016 by the United States Marshals Service ("USMS") in New York and transported to the Northern District of Georgia before appearing before a magistrate judge.[4]  Defendants did not make any statements and the Government did not obtain any evidence during the time between Defendants' arrest and appearance in court. Defendants seek an evidentiary hearing for the court to determine whether the failure to comply with Rule 5 was an oversight or a pattern and practice of conduct requiring

_____

[4]The docket for this case indicates that Defendants appeared before Magistrate Judge Anand on December 12 and 15, 2016. [Docs. 13 and 18].

17

dismissal of the indictment. [Doc. 42]. The Government responded relying in part on facts not in the record regarding the circumstances of Defendants' arrests and transfer to USMS custody (which the Government asserts occurred on December 10, 2016) and Defendants' alleged waiver of an initial appearance in New York and consent to removal [Doc. 50 at 2, Exhibits 1 and 2], to initially argue that no Rule 5 violation occurred. Alternatively, the Government argues that suppression of any statements or evidence obtained as a result of any Rule 5 violation, and not dismissal of the indictment, is the only remedy available to Defendants. [Doc. 50]. Defendants correctly point out that the facts relied on by the Government are not in the record and, apparently based on the waivers of initial appearance offered by the Government, reassert the need for an evidentiary hearing to determine if dismissal of the indictment is appropriate because "[t]he situation at bar is one which raises the specter of a repeated practice by the Marshal Service to circumvent the proper judicial procedures outlined in Rule 5[; i]f there is a persistent practice, the rights of defendants are consistently violated." [Doc. 52 at 3].

Having read and considered the arguments of the parties and the relevant and persuasive legal authority, the court denies Defendants' request for an evidentiary hearing and will assume for purposes of evaluating Defendants' motion that a Rule 5

AO 72A
(Rev.8/82)

violation occurred.  The waivers of initial appearance produced by the Government,

absent an evidentiary hearing to determine the voluntariness of the waivers, are only

pertinent to the issue of whether invocation of the court's supervisory powers is

necessary.  The court finds, as discussed *infra*, that dismissal of the indictment is not

an appropriate remedy for the Rule 5 violation.

## I.    Discussion

Rule 5 provides in pertinent part:

(a)    In General.
 (1)    Appearance Upon an Arrest
 (A)    A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge . . . .

(c)    Place of Initial Appearance; Transfer to Another District. . . .
 (2)    Arrest in a District Other Than Where the Offense Was Allegedly Committed.  If the defendant was arrested in a district other than where the offense was allegedly committed, the initial appearance must be:
 (A)    in the district of arrest . . . .

Fed. R. Crim. P. 5 (as amended 2009).[5]  Defendants are correct that, due to failure to

produce them before a magistrate judge in New York, they did not have the

_____

[5]Prior to amendment of the federal criminal rules in 2002, the provisions of subsection (c) of Rule 5 were set forth in Rule 40.  <u>See</u> Fed. R. Cr. P. 40, Advisory Committee Notes, 2002 Amendments.

AO 72A
(Rev.8/82)

opportunity to elect to have an identity hearing,[6] to be advised of their right to an attorney, of the charges against them and of their Rule 20 rights, and to have a bond hearing. [Doc. 42 at 2; Doc. 52 at 2-3]. Of course, upon appearance on December 12 and 15, 2016, before Judge Anand, Defendants were accorded all of those protections with the exception of an identity hearing. And the court notes that necessarily with all Rule 5 violations, a defendant, for some period of time, is denied one or more of these protections; however, as the Supreme Court and numerous lower courts have repeatedly held, Rule 5's purpose is to guard against the Government abusing the right to a prompt appearance before a judicial officer in order to obtain statements or evidence from that defendant and the remedy, if such evidence is obtained thereby prejudicing the defendant, is suppression.

In Corley v. United States, 129 S. Ct. 1558 (2009), the Supreme Court affirmed "that the plain purpose of the requirement that prisoners should promptly be taken before committing magistrates was to check resort by officers to secret interrogation of persons accused of crime." Id. at 1563 (citation and internal quotation marks omitted). Accordingly, confessions made during periods of detention in violation of

---

[6]Because Defendants were under indictment at the time of their arrests [Doc. 1], they were not entitled to a probable cause hearing and were being held based on a finding of probable cause by the grand jury.

AO 72A
(Rev.8/82)

Rule 5 are inadmissible.  Id.  Suppression of evidence and not dismissal of the

indictment is, in fact, the recognized remedy for a Rule 5 violation.  As the Eleventh

Circuit Court of Appeals stated, "The *only* remedy we have recognized for a violation

of Rule 5 is the suppression of evidence obtained as a result of the violation." United

States v. Carruthers, 458 Fed. Appx. 811, 818 (11th Cir. 2012) (emphasis added)[7]; and

see United States v. Baquis-Serrano, 2013 WL 5781611, at *2 (N.D. Ga. October 25,

2013) ("even if there was a Rule 5 violation, the federal courts uniformly have held

that dismissal is generally not an appropriate remedy for a violation of the prompt-

arraignment requirement of that rule").

And courts refuse to dismiss an indictment even when, as in the case before this

court, there is really no other remedy imposed for the Rule 5 violation because there

is no statement or evidence to suppress.  In fact, despite the denial or delay in affording

a defendant notice of his rights and a bond hearing when not promptly presented to a

---

[7]In United States v. Wilkerson, 170 F.3d 1040 (11th Cir. 1999), the court of
appeals reversed and remanded a decision by the district court dismissing an
indictment in part based on a violation of Rule 5.  Id. at 1042 & n.2.  The district court,
although acknowledging that the remedy of dismissal of an indictment for Rule 5
violations had not been recognized in the Eleventh Circuit, nonetheless - relying on
Ninth Circuit precedent - had found that the court's calculation of a sixty-four day
delay in presenting the defendant to a judicial officer required dismissal.  United States
v. Wilkerson, 992 F. Supp. 1358, 1361-62 (M.D. Fla. 1998).

AO 72A
(Rev.8/82)

judicial officer, courts have held that absent the government obtaining evidence during the period of the delay, a defendant does not suffer prejudice requiring another remedy, such as, of dismissal of the indictment. <u>See, e.g.</u>, <u>United States v. Colburn</u>, 401 Fed. Appx. 706, 708 (3rd Cir. 2010) (noting that the defendant did not make any statements during the twenty-one day delay in bringing him before a magistrate judge and that the remedy for a Rule 5 violation is suppression not dismissal of the indictment, the court rejected as a matter of law the defendant's contention that the violation constituted "outrageous conduct"); <u>United States v. Lawson</u>, 153 Fed. Appx. 209, 211 (4th Cir. 2005) (the defendant sought dismissal of the indictment for failure to present him for Rule 40 removal proceedings in the district of his arrest; however, because no evidence was obtained as a result of the violation, the court stated that "[w]here the alleged delay does not result in unwarranted interrogation, *no prejudice results*, and any violation of Rule 5 does not require dismissal of the indictment") (emphasis added); <u>United States v. Morrison</u>, 153 F.3d 34, 56 (2nd Cir. 1998) (same); <u>United States v. Fernandez</u>, 500 F. Supp. 2d 661, 666-67 n.3 (W.D. Tex. 2006) (denying motion to dismiss for violation of Rule 5 even though the alternative remedy of suppression was unavailable - no evidence was obtained); <u>United States v. Perez-Torribio</u>, 987 F. Supp. 245, 247 (S.D. N.Y. 1997) (noting that Rule 5 violations only require suppression of

22

evidence and finding that "[t]he remedy for any wrong done by the Marshals Service should not permit the defendant to escape punishment for a crime he may have committed[; r]ather, more appropriate remedies are available[, such as] pursu[ing] a civil remedy by bringing a claim under 42 U.S.C. § 1983").

Likewise, in this case, assuming that a Rule 5 violation occurred due to the failure to present Defendants promptly before a magistrate judge in New York before transporting them to the Northern District of Georgia,[8] the only remedy recognized in this circuit is suppression of any illegally obtained evidence.[9]  As noted, no such

---

[8]Based on Defendants' allegation that they were arrested in December 2016 [Doc. 42 at 1] and the record in this court establishing that they appeared before a magistrate judge on December 12 and 15, 2016 [Docs. 13 and 18], at most, Defendants' experienced a twelve to fifteen day delay in being accorded Rule 5 procedural rights.

[9]In fact, with the exception of the Wilkerson decision overturned by the Eleventh Circuit Court of Appeals and a decision by the district court in the Northern District of California, United States v. Osunde, 638 F. Supp. 171, 173 (N.D. Cal. 1986), which has been found against the weight of authority in other courts, see Fernandez, 500 F. Supp. 2d at 667 (noting that court in Osunde had dismissed an indictment for a Rule 5 violation involving a 106 day delay but that other courts have declined to follow that court) (citing United States v. DiGregorio, 795 F. Supp. 630, 634 & n.13 (S.D. N.Y. 1992) (denying the defendant's request to dismiss the indictment for a five month delay in bringing him before a judicial officer, the court declined to follow Osunde because the decision was against the weight of authority regarding the appropriate remedy for a Rule 5 violation)), this court has not located a decision holding that the remedy of dismissal results from a Rule 5 violation.

23

evidence was obtained. And the court finds that exercise of its supervisory powers to dismiss the indictment is not an appropriate remedy for a Rule 5 violation even if the USMS in the Eastern District of New York engages in a practice of presenting defendants arrested in that district with waivers of their Rule 5 rights.

The Supreme Court has recognized "that the federal courts 'may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress,'" such supervisory powers "deal strictly with the courts' power to control their *own* procedures . . . to prevent parties from reaping benefit or incurring harm from violations of substantive or procedural rules . . . ." United States v. Williams, 112 S. Ct. 1735, 1741 (1992) (citation omitted; emphasis in original); and see United States v. Montaner, 2012 WL 442985, at *7 (S.D. Fla. January 23, 2012) ("Federal courts may invoke their supervisory powers for three purposes: (1) to remedy a violation of a statutory or constitutional right; (2) to preserve judicial integrity; and (3) to deter future illegal conduct."). The district court in United States v. Noriega, 746 F. Supp. 1506 (S.D. Fla. 1990), aff'd, 117 F.3d 1206 (11th Cir. 1997), summarized the law guiding a court's exercise of its supervisory powers:

> The supervisory power doctrine, while it may serve to vindicate a defendant's rights in an individual case, is designed and invoked primarily to preserve the integrity of the judicial system and to prevent

AO 72A
(Rev.8/82)

the federal courts from becoming accomplices to government misconduct. . . . Courts have consequently invoked the doctrine to suppress evidence and dismiss indictments in the face of severe or pervasive prosecutorial abuse. . . . Thus, supervisory authority is in essence a judicial vehicle to deter conduct and correct injustices which are neither constitutional or statutory violations, but which the court nonetheless finds repugnant to fairness and justice and is loathe to tolerate. . . . As invocation of supervisory power to dismiss an indictment is a harsh remedy, it is reserved only for flagrant or repeated abuses which are outrageous or shock the conscience. . . . It is certainly not to be applied as a remedy for mere technical illegalities or inadvertent violations, as [t]hese powers should not permit the criminal to go free because the constable blundered. . . . Thus, a higher threshold of government misconduct is imposed for invocation of the supervisory power than that required to state a constitutional or statutory violation.

Id. at 1535-36 (citations and internal quotation marks omitted).

The failure to accord Defendants their right to a Rule 5 hearing in New York before being transported to this district, even if that procedural rule is allegedly violated on a reoccurring basis by the USMS's use of the waiver form, simply does not constitute conduct which the court finds "repugnant to fairness and justice and is loathe to tolerate." Id. at 1535. Use of the waiver form generally is not "outrageous" and does not "shock the [court's] conscience." Id. In fact, the use of such forms is recognized, including in cases involving a defendant's removal from the district of arrest to the charging district, because - as is true of any rights - a defendant may waive

AO 72A
(Rev.8/82)

procedural as well as substantive rights.[10] See, e.g., United States v. McConnell, 2017 WL 396538, at *6 (D. Minn. January 30, 2017) (rejecting a defendant's motion to dismiss the indictment for violation of Rule 5, involving a removal from the district of arrest, and discussing the execution of a waiver of Rule 5 rights, the court stated that "several courts have concluded that the procedural safeguards encompassed by Rule 5 can indeed be waived by the defendant" and joined those courts so holding) (citing United States v. Thompson, 772 F.3d 752, 762 (3rd Cir. 2014); United States v. Jacques, 744 F.3d 804, 815 (1st Cir. 2014); United States v. McDowell, 687 F.3d 904, 910 (7th Cir. 2012); United States v. Cabrera, 2008 WL 2803902, at *5 (S.D. N.Y. July 15, 2008)); United States v. Charleston, 2016 WL 7422685, at *9 (N.D. Ga. November 21, 2016) (finding that the right to prompt presentment may be waived and that the defendant had done so), report and recommendation adopted by 2016 WL 7406451 (N.D. Ga. December 21, 2016).

And Defendants' reliance on United States v. Torres-Iturre, 2016 WL 2757283 (S.D. Cal. May 12, 2016), to argue that exercise of the court's supervisory powers

---

[10]The court is not finding that Defendants voluntarily waived their Rule 5 rights in this case. As already noted, the court has assumed a Rule 5 violation occurred. The court is simply noting that, because such waivers have been allowed, the USMS use of waiver forms generally does not rise to the level of misconduct supporting exercise of the court's supervisory powers to dismiss the indictment.

26

might be an appropriate remedy for a Rule 5 violation fails as a matter of law in light of Eleventh Circuit precedent.[11]  In <u>Torres-Iturre</u>, the court rejected the defendant's motion to dismiss the indictment stating, "To obtain dismissal for some government misconduct . . ., there must be a showing of 'outrageous conduct' which violates the defendant's due process rights under the Fifth Amendment, or a violation of some other substantive right . . . ."  <u>Id.</u>, at *4 (citing, *inter alia*, <u>United States v. Russell</u>, 93 S. Ct. 1637 (1973)).  The court found that "[a] court may dismiss an indictment under its supervisory powers 'only when the defendant suffers substantial prejudice, and where no lesser remedial action is available.'"  <u>Id.</u> (citation omitted).[12]  Besides the

---

[11]Additionally, no Ninth Circuit Court of Appeals decision found by the court nor cited by Defendants upheld dismissal of an indictment for a Rule 5 violation; instead, the appellate courts follow the general rule that suppression of any evidence obtained during the period of the delay is the appropriate remedy.  <u>See, e.g.</u>, <u>United States v. Mejia</u>, 39 Fed. Appx. 568, 569-70 (9th Cir. 2002) (although finding that the thirteen day delay in bringing the defendant before a judicial officer was "reprehensible," the court stated that it had "declined to remedy [a Rule 5 violation] where no incriminating evidence was obtained during the delay" and finding that the defendant had "failed to demonstrate that the circumstances of his detention require[d] 'the drastic remedy' of dismissal") (citation omitted); <u>Bayless v. United States</u>, 381 F.2d 67, 70 (9th Cir. 1967) (assuming that defendant was not presented to a judicial officer for "nearly four months" or "indeed, at all" and that a Rule 5 violation occurred, the court held that the only remedy for the violation was suppression of any evidence obtained during the period of the delay - no such evidence existed).

[12]Likewise, in <u>United States v. Aldissi</u>, 2014 WL 5426630 (M.D. Fla. October 22, 2014), the district court found that application of supervisory authority to dismiss

AO 72A
(Rev.8/82)

fact, as the court has already concluded, that the conduct here is not outrageous and does not impact Defendants' due process rights nor unfairly prejudice the trial of their case, the problem with Defendants' attempt to apply <u>Torres-Iturre</u> to facts in this case is that the Eleventh Circuit Court of Appeals has foreclosed dismissal of an indictment for outrageous government misconduct, as referenced in <u>Russell</u>, that does not impact a defendant's involvement in the underlying offense. Alleged misconduct occurring after arrest or indictment does not fall within the scope of <u>Russell</u>'s outrageous government misconduct doctrine. <u>See</u> <u>United States v. Jayyousi</u>, 657 F.3d 1085, 1111 (11th Cir. 2011).

The facts in <u>Russell</u> concerned the government's involvement during the investigation of the criminal conduct resulting in an indictment. These governmental actions facilitated the commission of the crime and allowed the criminal conduct to continue with government assistance, and they supported an entrapment defense at trial. <u>Russell</u>, 93 S. Ct. at 1641-42. The Supreme Court rejected the defendant's attempt to establish a constitutional violation which would result in dismissal of an indictment "when it is shown that the criminal conduct would not have been possible

---

an indictment requires a showing that "the defendant's case has been unfairly prejudiced." <u>Id.</u>, at *4 (citations and internal quotation marks omitted).

had not an undercover agent 'supplied an indispensable means to the commission of the crime that could not have been obtained otherwise, through legal or illegal channels.'" <u>Id.</u> at 1642 (citation omitted). The Supreme Court noted in dicta that:

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . ., the instant case is distinctly not of that breed. . . . The law enforcement conduct here stops far short of violating that "fundamental fairness, shocking to the universal sense of justice," mandated by the Due Process Clause of the Fifth Amendment.

<u>Id.</u> at 1643 (citations omitted). That day has not yet arrived. In fact, the Eleventh Circuit Court of Appeals recently stated, "We have never applied the outrageous government conduct defense and have discussed it only in dicta." <u>Jayyousi</u>, 657 F.3d at 1111. It is apparently questionable whether such a defense is even recognized in the Eleventh Circuit. <u>Id.</u> (the court has "never acknowledged the existence of the outrageous government conduct doctrine"). Moreover, even if the Eleventh Circuit had recognized the defense, as noted, the court in <u>Jayyousi</u> held that "the actionable government misconduct must relate to the defendant's underlying or charged criminal acts." <u>Id.</u> at 1111-12 ("'Outrageous government conduct occurs when law enforcement obtains a conviction for conduct beyond the defendant's predisposition by employing

29

methods that fail to comport with due process guarantees.'") (citation omitted)[13]; and see United States v. Philippe, 2017 WL 1035518, at *8 (S.D. Fla. March 17, 2017) (recognizing limitation on application, if the doctrine exists, of dismissal of an indictment for outrageous government misconduct to relating to the defendant's underlying criminal acts). Accordingly, denying Defendants the right to appear before a judicial officer in New York and unnecessarily delaying their presentment to any judicial officer for a short period of time, occurring well-after the criminal conduct at issue was completed and the indictment returned, simply does not in the Eleventh Circuit Court of Appeals fall within the scope of conduct warranting dismissal of an indictment for outrageous government misconduct. And Defendants offer no decision in any other circuit with allegations of comparable "misconduct" as asserted herein in

---

[13]The District Court for the Southern District of Florida noted that the doctrine espoused in Russell "comes up almost exclusively within the context of government involvement in the defendant's crime and entrapment." United States v. Padilla, 2007 WL 1079090, *3 (S.D. Fla. April 9, 2007). The court also noted that part of the difficulty in determining the contours of the doctrine is based on the fact that no defendant has ever successfully argued that the doctrine is applicable to a criminal proceeding. Id. This fact, the court noted, "bears testament to the claim's severely narrow scope." Id.; and see United States v. Guerrero, 2013 WL 5530613, at *3 (N.D. Ga. May 9, 2013) (noting that the decision in Jayyousi casts doubt on the continuing validity of the outrageous government misconduct defense).

which a court found a due process violation or that a defendant's right to a fair trial was unduly prejudiced. Defendants are not entitled to dismissal of the indictment.

## II.    Conclusion

For these reasons, the court denies Defendants' request for an evidentiary hearing and **RECOMMENDS** that Defendants' motion [Doc. 42] to dismiss the indictment be **DENIED**.

### Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendants motions [Docs. 26, 28, 38 and 39] to suppress be **DENIED** and that Defendants' motion [Doc. 42] to dismiss the indictment be **DENIED**. The court **DENIES** Defendants' request for an evidentiary hearing on the motion to dismiss.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial as to Defendants Pertha and France.

31

**SO ORDERED,** this 9th day of May, 2017.


JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)